Filed 9/5/24  In re D.O. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re D.O., a Person Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CYNTHIA T.,<br><br>Defendant and Appellant. | F087368<br><br>(Super. Ct. No. JD142498-00)<br><br>**OPINION** |

APPEAL from an order of the Superior Court of Kern County.  Susan M. Gill, Judge.

Cynthia T., in pro. per., for Defendant and Appellant.

Margo A. Raison, County Counsel, and Kelli R. Falk, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Paternal grandmother, Cynthia T. (Cynthia), in propria persona, contends on appeal that the juvenile court's order denying her September 18, 2023, petition, filed

pursuant to Welfare and Institutions Code section 388,[1] must be reversed and remanded because (1) there is insufficient evidence to support its finding that the Kern County Department of Human Services (the department) exercised due diligence in its search for D.O.'s (minor) relatives, pursuant to section 309, subdivision (e)(1) and California Rules of Court, rule 5.534(b)(3);[2] (2) the court erred by not applying section 361.3's relative placement preference; and (3) the court abused its discretion when it found it is not in minor's best interest to be placed with her. We affirm.

## INTRODUCTION

On September 23, 2021, when minor was six years old, his mother, S.O. (mother), took him from B.M. (father)'s home in Texas to California. There, she surrendered minor to the department, and he was placed with foster parent. Minor has remained with foster parent throughout the proceedings.

On September 29, 2021, at the first hearing on minor's case, father appeared remotely and stated to the court that both his parents (minor's paternal grandmother and paternal grandfather) were alive but did not state their names.

A family finding and engagement social worker, Juan Arredondo, was assigned to minor's case from September 24 to November 5, 2021. Arredondo attempted to call father one time for the purpose of searching for minor's relatives. Father did not answer, so Arredondo left a voicemail. He also mailed a family finding parent information packet to father with a family tree for him to fill out, but father did not return the completed packet to the department. Arredondo stated in the department's reports that he located 20 maternal relatives and 18 paternal relatives and mailed 16 family finding information packets to the relatives, but he did not identify which relatives these were, nor whether he asked any of the relatives he located about the names and contact information of other

---

[1] All statutory references are to the Welfare and Institutions Code.

[2] All rule references are to the California Rules of Court.

2.

relatives. After 30 days, Arredondo closed the family finding search. Paternal grandmother Cynthia's name was never discovered and was not on any of the department's documentation.

During the same time period as Arredondo was conducting the family finding search, a department paralegal, Peggy Byrd, was able to contact father by phone regarding the Indian Child Welfare Act (ICWA) inquiry. Byrd obtained information from father regarding minor's potential Native American ancestry on paternal grandfather (D.M.)'s side of the family. However, she did not record any name or contact information for minor's paternal grandmother (Cynthia), because father told her she did not have Native American ancestry. The ICWA Family Tree simply states "Does Not Apply" in the "Child's Paternal Grandmother" category. Father also remotely appeared at multiple subsequent juvenile court hearings during this time period.

On March 30, 2022, the juvenile court found the department exercised due diligence in its search for minor's relatives.

On September 30, 2022, the court terminated reunification services for father, and on January 13, 2023, it terminated reunification services for mother.

After the juvenile court's finding of due diligence, father stopped appearing at court appearances or responding to contact attempts by the department and the court set the case for a section 366.26 hearing.

More than a year later, the court finally located father in a correctional facility in Texas and sent him the section 366.26 termination of parental rights notification. Father's section 366.26 notification was sent from the correctional facility to Cynthia, who was residing in Missouri.

On March 26, 2023, when Cynthia received father's section 366.26 notification and learned the termination of his parental rights to minor was imminent, she filed her first section 388 petition alleging she had not known until receiving father's section 366.26 notification that minor was in foster care. She stated she only knew that

3.

his mother had taken minor to California and that father told her he was doing what he needed to get him back. The juvenile court denied her petition, finding she had knowledge minor was in foster care from father. Cynthia did not appeal the court's ruling.

Soon after, on September 18, 2023, she filed her second section 388 petition.

The court again denied her petition, this time finding the department exercised due diligence based on Arredondo stating he was never able to contact father. It also found section 361.3's relative placement preference was inapplicable and that placing minor with Cynthia was not in his best interest because he had been with foster parent for approximately two years, was happy there, and foster parent wanted to adopt him. Cynthia timely appealed the court's order.

## FACTUAL AND PROCEDURAL SUMMARY

Mother and father lived in Midland, Texas and were in a romantic relationship for several years. They had three children together: twin boys (the twins), and minor, born in October 2014. Mother suffers from mental illness. Her relationship with father deteriorated so she stopped living with father and the children.[3] Father was living with and caring for minor and the twins without her for approximately two years. However, in 2021, when minor was six years old, mother took minor from father's home. She transported minor to Bakersfield, California and did not maintain contact with father. The twins continued living with father in Texas.

While in Bakersfield, mother and minor lived at an unhoused shelter. However, they left the unhoused shelter and moved to a tent. After one night in the tent, mother contacted the department and asked for minor to be removed from her care. On September 23, 2021, law enforcement retrieved minor from mother and transferred him

---

[3] Between 2004 and 2021, there were at least 15 referrals against mother and/or father in California and Texas, alleging child abuse and neglect. All of the referrals were deemed either unfounded or inconclusive.

to the department's care.  The department placed minor with foster parent shortly afterwards.

The department initially discussed placing minor with maternal grandmother (L.C.) in Fresno.  However, mother soon went to live with L.C.  The department deemed it unsuitable for L.C. to have guardianship of minor while mother was also living with her.

After minor was removed from mother's care, the department made contact with father in Texas.  Father participated remotely in juvenile court proceedings.  The court offered father and mother family reunification services.

### *Section 300 Petition*

On September 28, 2021, the department filed a dependency petition for minor alleging he came within the provisions of section 300, subdivision (b).  The petition alleged:  "[t]he child, … has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness by the willful or negligent failure of the mother … to provide the child with adequate [food, clothing,] shelter[, or medical treatment]" (§ 300, subd. (b)(1); count b-1); "[t]he child … has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness by the inability of the mother … to provide regular care to the child due to mother's mental illness[, developmental disability, or substance abuse]" (§ 300, subd. (b)(1); count b-2).

### *September 28, 2021, Detention Social Study*

The report stated that L.C. told social workers that father lived in Texas with minor's twin brothers.

The report stated that on September 27, 2021, a social worker attempted to contact father.  He did not answer the phone, so the social worker left a message requesting a call back.  The report stated that on September 28, 2021, the social worker again called father.  The report noted Native American ancestry on minor's paternal grandfather's side of the family.

5.

*September 29, 2021, Detention Hearing*

On September 29, 2021, the juvenile court held a detention hearing. The court ordered minor detained from mother and found reasonable efforts were made to prevent or eliminate the need for removal of minor from the physical custody of mother and father. It declared father to be minor's presumed father. Father requested minor be released to his custody.

The juvenile court asked father about Native American ancestry for minor, and found, as to father, ICWA applied. Father stated minor had Native American ancestry through minor's paternal grandfather (D.M.) and D.M.'s mother (minor's paternal great-grandmother).

Father testified, "My mother and my father are both alive," referring to Cynthia and D.M., but father did not state his parents' names in court. The juvenile court replied, "Good. So you can contact them." The court did not ask for their names, but asked social worker, Pamela Castillo, who was present at the hearing if father had given her their contact information. Castillo replied, "Not yet."

*September 30, 2021, Detention Hearing*

The juvenile court stated mother and father were to disclose to the social worker the names, residences, and any known identifying information of any maternal and paternal relatives. It ordered the social worker to evaluate any interested relative or nonrelative extended family member and authorized minor to be placed with that individual if they were appropriate.

*October 19, 2021, Social Study Report*

The October 19, 2021 report stated the social worker submitted a referral for inquiry pursuant to ICWA for father on October 8, 2021.

*October 22, 2021, Jurisdiction Hearing*

The juvenile court granted a request for a continuance and "encourage[d] [father] to communicate with [Byrd] on his Native American heritage and family information."

6.

### *November 1, 2021, ICWA-030 Form*

On November 1, 2021, the ICWA-030 form was filed with the juvenile court. It recorded mother and father's information and stated that father reported Native American heritage.

It stated minor's paternal grandfather D.M.'s name and address, noting he had Native American heritage. It also stated D.M.'s parents (minor's paternal great-grandparent's) names, and noted they were deceased.

The ICWA-030 form did not state Cynthia's name and address, only stating "Does not apply" in the "Child's Paternal Grandmother" section.

Notification was sent to the tribes to which minor was potentially related through D.M.'s side of the family.

The tribes all responded that minor was not eligible for enrollment in their tribes.

### *February 8, 2022, Social Study Report (Summary of Arredondo's Family Finding Search and Byrd's ICWA Inquiry)*

The report stated that on November 12, 2021, a social worker contacted father. He stated he planned to attend the next juvenile court hearing and wanted placement of minor. On January 27, 2022, a social worker made phone contact with father, who said he wanted placement of minor and that he had been having twice weekly phone visits with minor. Father did not complete any drug tests. Mother did not complete her drug tests and frequently missed visits by phone or in person with minor.

*Arredondo's Family Finding Search*

The report stated that on October 1, 2021, Arredondo attempted to call both mother and father regarding family finding services but left voicemails for each requesting a call back when neither answered his calls. The report also stated Arredondo mailed a family finding parent letter, relative log, postage prepaid return envelope, civil rights pamphlet and a pamphlet called "Important Information for Relatives Considering Placement of a Child" (IIR) to father and mother, and on the same date, mailed "AB938

7.

letters," a civil rights pamphlet, and an IIR pamphlet to minor's *maternal* relatives. It stated Arredondo also attempted to make telephone contact with L.C.

The report stated that on October 5, 2021, Arredondo was contacted by L.C. regarding placement of minor. He stated he explained the resource family approval out-of-county assessment request, and that L.C. said she would contact him again once she had the necessary information and that she understood the process. He did not state that he asked her for information about other relatives.

The report stated that on November 1, 2021, Arredondo mailed "AB938 letters," a civil rights pamphlet, and an IIR pamphlet to minor's "*paternal* relatives." However, *the report does not specify to which paternal relatives he mailed the information*.

On November 5, 2021, Arredondo closed the family finding portion of minor's case. The report stated he was "able to identify 20 maternal relatives (including children and deceased relatives) and 18 paternal relatives (including children and deceased relatives). Social Worker Arredondo mailed out 16 AB938 notification letters, Civil Rights Pamphlets, and Relatives Considering Placement of a Child Pamphlets." *The report does not state the names of the relatives Arredondo was able to identify*, *or to which relatives he mailed the 16 family finding information packets*. Apart from the single phone call on October 1, 2021, that father did not answer, Arredondo did not attempt to contact father again during his family finding search.

*ICWA Inquiry*

The report stated Byrd was able to contact father by phone on October 18, 2021, regarding ICWA, to investigate his claims of Native American heritage. It stated father was not a tribal member but that father's paternal grandmother (D.M.'s mother and minor's great-grandmother), was a tribal member but was deceased. He told Byrd that minor's paternal grandfather's name was D.M., but stated he had no contact with him, and that "they do not talk and [father] does not know if [D.M.] is a [tribal] member."

Byrd did not ask father about Cynthia, as her inquiry was limited only to father's reported Native American ancestry on D.M.'s side of the family.

On October 18, 2021, Byrd mailed father an ICWA letter, which included a family tree, a family tree questionnaire, and a postage prepaid return envelope.

### *February 9, 2022, Disposition/Jurisdiction Hearing*

At the February 9, 2022 hearing, the juvenile court found minor was not an "Indian child" pursuant to ICWA.

### *March 30, 2022, Disposition/Jurisdiction Hearing (Court's Due Diligence Finding)*

At the March 30, 2022, hearing, the juvenile court found mother and father made minimal progress toward alleviating or mitigating the causes necessitating placement and stated minor must be returned to the parents or placed for adoption or with a legal guardian by March 23, 2023. The court denied father's request for placement because it found clear and convincing evidence such placement would be detrimental to minor's safety, protection, or physical or emotional well-being.

Family reunification services were ordered for a period not to exceed 12 months, expiring on November 22, 2022. Mother and father were both ordered to participate in counseling for child neglect and parenting, and to submit to random, unannounced drug tests on a monthly basis. It stated mother and father were advised that if the physical custody of minor was not restored within the time frame allowed by law, a proceeding pursuant to section 366.26 may be instituted and parental rights may be permanently terminated. An Interstate Compact on the Placement of Children (ICPC) referral was ordered on behalf of father.

*The minute order from the hearing states the juvenile court found the department "has used due diligence in conducting its investigation to identify, locate, and notify [minor's] relatives."*

9.

*September 20, 2022, Social Study Report*

The September 20, 2022, report stated father was presumed to reside in Texas and that notice of the upcoming section 366.21, subdivision (e) review hearing had been mailed to his last known address.

Social worker Kayla Miller attempted to contact father to discuss his case plan on April 21, May 17, July 19, and July 25, 2022, but his phone number was not in service. Father was mailed a case plan on April 1, May 3, June 1, and July 1, 2022.

On May 20, 2022, Miller attempted to contact D.M. The report states, "On May 20, 2022, … Miller attempted to make telephone contact with the family members of the father. [Miller] utilized the … Family Tree Summary. [Miller] attempted to make contact with [D.M.], however, the phone number listed was no longer in service." Miller also stated, "On June 1, 2022, … Miller received the returned case plan letter for the father. The letter stated, 'return to sender, vacant, unable to forward.' " "On June 3, 2022, … Miller mailed the father, … a copy of his case plan which included his upcoming [juvenile] court hearing and a scheduled telephone appointment." "On June 24, 2022, … Miller requested a social media search." On June 27, 2022, the department found two social media profiles for father and messaged the profiles but did not receive a response. On July 25, 2022, Miller received a returned case plan letter that she had sent to father. It stated, "return to sender, not deliverable as addressed, unable to forward."

The report stated, "[F]ather's whereabouts are currently unknown. The father has not made himself available to the Department for his review period, therefore, his case plan progress is unknown. No drug test[s] have been provided to the Department. [¶] An [ICPC] was not submitted, due to the father['s] unknown whereabouts."

The report recommended family reunification services be terminated for father and reunification services for mother be continued.

*September 30, 2022, Section 366.21, Subdivision (e) Review Hearing*

The juvenile court reviewed minor's status pursuant to section 366.21, subdivision (e) and the department's case plan was adopted as modified, terminating reunification services for father. It found minimal progress by mother and father at alleviating or mitigating the causes necessitating placement, and that both parents had not made acceptable efforts to facilitate a return of minor to either of their care. The court found clear and convincing evidence that father failed to contact and visit minor and that a return to either parent would create a substantial risk of detriment to minor.

*November 1, 2022, Social Study Report*

The department's November 1, 2022, social study report stated notice of the section 366.21, subdivision (e) review hearing was mailed to father on October 27, 2022, to his last known address. The social workers found minor was doing well with foster parent.

*January 11, 2023, Supplemental Social Study Report*

The department's January 11, 2023,[4] supplemental social study report stated minor expressed " 'he wants to live with [foster parent] and have visits with his mom.' "

*January 13 Section 366.21, Subdivision (f) Review Hearing*

Father and mother did not appear at the section 366.21, subdivision (f) review hearing. The juvenile court reviewed minor's status pursuant to section 366.21, subdivision (f) and adopted the department's plan, as modified, terminating reunification services for mother.

The juvenile court stated a hearing pursuant to section 366.26 was to be held within 120 days.

---

[4] Subsequent references to dates are to dates in 2023.

### *April 3 Section 388 Petition (Cynthia's First Section 388 Petition)*

On April 3, Cynthia filed a request to change the juvenile court order pursuant to section 388.

Cynthia's section 388 petition stated father was incarcerated in Texas and no longer lived at his last known address used by the department. She stated that the selection of a permanent plan for minor was no longer necessary because minor was her grandson, and she was an immediate family member who could care for him. She stated she wanted minor to live with her so she could "give him the security, love, and financial support that his parents did not provide."

The petition stated, "I was just informed through the mail as I received a copy of [the notice for the upcoming section 366.26 hearing] from [father] on March 24, 2023. I immediately called [California] to find out what I could do to declare my rights as a grandparent and to stop the permanent adoption of [minor]. I was told to fill out forms and file them with the Clerk of the Court." She stated,

> "I want to obtain guardianship of [minor] or do what needs to be done to be able to have [minor] live with me. He does not need to be with a foster family and I can care for him. [¶] It would be better for [minor] because I am a blood relative and he knows me. I can provide stability and safety plus maintain the relationship with his siblings. I will provide the best well-being and support. If he lives with me then he would be around many family members. [¶] … [¶] There is a long history of neglect from [mother]. She took [minor] from his father's home in … Texas where he lived with [the twins] and one step-sister. [Mother] fled to California without telling anyone she had taken [minor]. I could not find out any information in regards to [minor]. I don't know the circumstances that led up to [minor] being with a foster family in Bakersfield. I wholeheartedly believe that he needs to be with his immediate family members."

The juvenile court ordered a hearing on the matter.

### *May 5 Supplemental Social Study Report*

The May 5 supplemental social study report outlined the information found by Arredondo on minor's extended family in April 2023 for the ICWA inquiry, after Cynthia

12.

filed the section 388 petition and more than a year after the family finding search was completed. Arredondo stated that while researching minor's Native American ancestry during the reopened ICWA inquiry in April and May of 2023, he attempted to contact mother, father, L.C., a maternal aunt (Sh. O.), D.M., and M. S.-M., D.M.'s second wife and minor's paternal *step*-grandmother, who Arredondo mistakenly referred to in the report as minor's paternal grandmother.[5] He was not able to contact father, but spoke to D.M. He stated,

> "On May 1, 2023, I … attempted to contact [D.M.] regarding the Native American ancestry for the minor, …. I asked [D.M.] if there was any Native American ancestry … I asked [D.M.] if there was any Native American ancestry on the paternal grandmother's[6] side of the family. I asked for her contact information and [D.M.] did not provide her contact information and only stated the only Native American ancestry [is] from his mother's side of the family. I asked [D.M.] if he was interested in contact with the minor. He stated he was interested in contact with [minor]. I provided [D.M.] with the contact information to the minor's primary social worker."

Arredondo did not ask D.M. for Cynthia's name or contact information regarding placement of minor, and only inquired about minor's relatives with Native American ancestry for purposes of ICWA. Arredondo stated an ICWA inquiry was submitted on May 3.

---

[5] M. S.-M. is D.M.'s second wife. Consequently, she is minor's paternal *step*-grandmother. D.M.'s ex-wife, Cynthia, is father's mother, and minor's biological paternal grandmother. Here, Arredondo mistakenly refers to minor's paternal *step*-grandmother, M. S.-M., as minor's paternal grandmother.

[6] Arredondo did not specify the name of the "paternal grandmother" to whom he was referring. Earlier in the report, he inaccurately described M. S.-M., D.M.'s second wife and *step*-grandmother of minor as the "paternal grandmother." In the context of Arredondo's statements, we conclude Arredondo was again mistakenly referring to M. S.-M. as the "paternal grandmother." Cynthia and D.M. are father's parents.

The report stated Cynthia reported that on March 26, father provided her with a copy of the section 366.26 notification, and she immediately contacted the department to get placement and legal guardianship of minor. It stated Cynthia reported she was previously unaware of minor being in the department's custody, as she had not been informed of his status by father or the department.

The report stated, "Departmental records have been reviewed and there is *no evidence that* [*Cynthia*] *was notified that* [*minor*] *was in the Department's custody*." (Emphasis added.)

It states that on April 18, the department's "family finding" supervisor was contacted to investigate the matter. Arredondo responded, stating he was "unable to notify [Cynthia], as the father never responded to his attempts to contact him." He stated, "father … never made contact with me. I mailed him a letter on [October 1, 2021,] and left a voicemail," and thus, he did not have Cynthia's name or contact information.

The report stated a social worker contacted Cynthia on April 10 and explained how she could apply for placement of minor. On April 10, Cynthia completed a resource family application.

The report stated Cynthia's last contact with minor was over a year prior, when he was six years old. She stated she did not have custody of minor's siblings, the twins, but planned to get custody of them because father was incarcerated. She stated she spoke on the telephone with minor the week prior to the report and that he recognized her. She stated there were no issues with the call and that it went well. The report stated no concerns were reported regarding Cynthia's comfort calls with minor.

The report stated minor had formed a strong relationship with foster parent and has been observed to appear calm, happy, and comfortable around foster parent. It stated that "[p]lacing [minor] with [Cynthia], with whom he has never lived, and has had no contact with for approximately two years (until April 2023), would necessitate severing his relationship with his [foster parent], and would jeopardize his permanency goal of

14.

adoption. At this time, it is not in [minor]'s best interest to be removed from his current home and placed with his relative."

### *May 10 Section 388 Modification/Section 366.26 Hearing*

The juvenile court denied Cynthia's petition. Cynthia was not represented by counsel at the hearing.

The juvenile court found father received timely notice of the section 366.26 hearing because he was "served by certified mail, return receipt requested … somebody signed the receipt. He was in a correctional facility. That was done on February 3, 2023."

Cynthia testified,

> "My mother passed away in 2020 and my father has had dementia, so I was—I committed to living with him. He needed care 24/7. And so from 2020 to 2022, I was pretty much caring for him in his home 24/7. And so that really—*I had my hands tied at that point and was hoping that the parents were taking care of what was needing to be done to get [minor] back.*

> "And then during that time or prior to that time, I was visiting my parents as much as I could, knowing that it was—my mother was near death, at that point. And what I understood happened, *all I knew was that [minor]'s mother had shown up, taken [minor] without permission, and only for us to discover that he had been taken to California and was in the foster system, at that point.*

> "Again, *I believe [father] was doing what he needed to do to try to get his son back.* And then he took a down[ward] spiral. And then when he became incarcerated, only at that point did [father] send me that paperwork [about the section 366.26 hearing], the one from February that had been mailed to him, and that's when I started to react immediately upon needing to step in and try to stop a full placement in California. And I have since filed the adoption paperwork as well, and I feel like I would be the best care for [minor] because I am now living in Missouri where a lot of his relatives live."

None of the parties' counsel asked Cynthia any questions or clarifications about her testimony.

Minor's counsel asked the juvenile court to deny the request. Minor's counsel argued Cynthia was "fully aware of [minor]'s situation and didn't take action" and that it was in minor's best interest to remain with the foster parent. Minor did not attend the hearing or give his opinion to the court.

The juvenile court stated, "*it does appear that [Cynthia] has had notice of [minor]'s situation even if not from the Department … but rather from her son since this matter commenced*. So I am denying the modification request .…"

### *August 16 Section 366.26 Hearing*

On August 16, the juvenile court continued the section 366.26 and reopened the ICWA inquiry. The court confirmed father was incarcerated in Texas.

### *September 15 Section 388 Request to Change Juvenile Court Order (Second Section 388 Petition)*

On September 15, Cynthia, represented by counsel, filed a second section 388 petition, requesting to change the juvenile court's order. It stated the court made an order that,

> "Vested authority for care, custody and control of [minor] with the [department], who placed [minor] in a foster home. [Section] 358, [subdivision] (b)(2), also mandated that the [department] undertake family finding efforts and that evidence be presented so the court could make a finding that the [department] had used due diligence in identifying and locating relatives as required by law. The court erroneously made that finding as I believe the [department] admitted its early failure in [the May 5, 2023 supplemental social study] report. [¶] The [department] acknowledged its [family finding] failure. I only became aware of [minor] being in foster care on [March 23, 2023]. I immediately contacted [the department] and court to request placement, but I had to [undergo] ICPC process which was just completed/approved [August 18, 2023] .… I am now legally eligible for placement of [minor] whereas I was not before. The [administrative] process to evaluate my request, hold CFTM will likely not conclude before the next [hearing] to [terminate parental rights] on [October 18, 2023]."

16.

The petition stated Cynthia wanted the juvenile court to order that "the [department] failed to exercise due diligence in [family finding], and correct the failure by placing [minor] with me for purposes of adoption." The petition stated that if anyone disagrees with the request, it would be because "the county will likely disagree based on the length of [minor]'s placement in his current foster home. There is a continued [section] 366.26 hearing pending on October 18, 2023."

The petition included 60 pages of supporting attachments.

The attached approved ICPC discussed Cynthia's desire to "provide [minor] with a safe, stable, loving and secure home … as long as she is allowed to do so and will provide permanency if that is determined to be warranted." The ICPC attachment stated, "[She] is [minor]'s paternal grandmother and though she was shut out of much of his life, she loves him and is devoted to caring for him." It described Cynthia's family and family history in a positive light, and stated Cynthia received two Masters degrees and was discharged honorably from the United States Air Force. It further stated she has two sons: father and his brother R.M. and that R.M. lives close to Cynthia and is a great support to her. It stated Cynthia has never been arrested and has no history of abuse or neglect as a victim or perpetrator, and no mental health concerns and has never been treated for substance misuse. It stated she owns her home in Missouri and "is committed to caring for minor as long as she is allowed to do so and though she would like more information about what he has endured, she will not shy away from this responsibility for any reason. She has the benefit of her sister in the home for help and support, as well as her adult son [R.M.]." It also stated that Cynthia's finances were reviewed and she is not under financial strain and is able to provide for minor's basic and higher level needs and that she "verbalizes the importance of [minor] having his biological family ties. She will assure that he remains in contact with his siblings and recognizes the vitality of that bond. [¶] … [¶] She believes it is important that she provide a sense of belonging and

17.

assurance that [minor] feels loved.  She knows that the relationships [minor] builds will provide a sense of identity and self-esteem.”

The attachments to Cynthia's petition also included a summary of Cynthia's relationship with minor before mother took him to California, including pictures of them together shortly after his birth and throughout his childhood until he was approximately five years old.  She stated in one of the attachments to the petition,

> “My relations with [minor] involved as many visits as possible (two visits a year, three times if lucky) with living in different states either traveling from Missouri to Texas or Texas to Missouri.…  I mailed boxes and cards for holidays and birthdays if we could not travel to see each other.  In addition to physical visits, we would call or [have video calls].”

She also stated,

> “I am not sure when this case first began.  Because of the loss of my mother and my hands being full taking care of my father 24/7, [father] did not inform or involve me with the challenges he was faced with but told me [mother] had taken [minor] to [California] without his permission.  He … talked briefly about having to explain his living situation in [Texas] (submitting home photos) in efforts to get [minor] back.…  [Father] became depressed, lost his way, spiraled down[ward] and ended up in jail around September of 2022.…  It was not until after my father's passing, I settled my parent's estate, and relocated to [Missouri] that I received paperwork from [father] stating that [minor] was up for final placement.  Upon getting that notice, I acted quickly to find out what I could do to stop this from happening.  I called [the juvenile court] and was told to file a [section] 388 [petition] prior to the [section 366.26] hearing on May 10, 2023.…  I got a letter from [a social worker] .…  In many of my phone calls to [the social worker], she did admit to me at one point that maybe I had a case of not being officially informed as the biological grandmother of [minor] and not informed of my options early on.  She admitted that I should get a lawyer.…”

> “I found out through my Missouri ICPC social worker that [minor] entered into foster care in [California] in [September 2021,] because mother handed him over to the state because she could not take care of him.…”
> [¶]  …  [¶]  I immediately intervened with [minor]'s case in March 2023.  I received the [termination of parental rights notices] from [father] while incarcerated.…  Through [the United States Postal Service], the letter had

18.

been rerouted from [the] Texas address to my new … permanent address in [Missouri] which took an additional month to receive. [¶] I called the Kern County court to figure out what to do. I was directed to fill out Stop Order forms [section] (388) and get them filed before the May 10, 2023 court hearing for [minor] (Termination of Parental Rights). This was accomplished by April 3, 2023." (Emphasis omitted.)

The attachments to the petition also included letters to minor from the twins, stating they love and miss him, and numerous photos of minor with the twins.

Cynthia's petition also included an attachment wherein she outlined the alleged failure of the department to notify her about minor's status. In the attachment, she stated she would have been "easily found," had the department exercised due diligence in investigating her side of minor's family, as she was also with her father (minor's great-grandfather) in Texas during the family finding period, but the department also failed to find or investigate her parents, and that "no one contacted her or notified her until she got the notices of the [upcoming section 366.26] hearing in March 2023, prompting her to call the [department]." She stated in the attachment to her petition, "the [department states that] Arredondo had reached out to the father on [October 21, 2023,] and never got a response. Yet the father's recollection (from his attached statement), and father's review of department reports, show actual contact with father by a social worker, (Alicia Aguilar) on [September 28, 2021] …; [September 29, 2021] and [September 30, 2021] when father was present in court by phone for initial hearings …; [October 22, 2021] with social worker Deuberry …; and [on November 12, 2021] and [January 27, 2022] with social worker Kayla Miller.… In addition, family trees were being developed for ICWA compliance all this time."

The attachments to Cynthia's petition also included a statement from Cynthia of what she alleges father told her, including that a social worker contacted father asking about Native American ancestry and that he gave them D.M.'s contact information and told them D.M.'s parents' names. Cynthia also alleges in an attachment to her petition that father told her he gave the social worker Cynthia's contact information and the

19.

names of Cynthia's parents.  Cynthia also stated in the attachment to her petition that any mail sent by the department to father's house with her name on it was thrown away by father's girlfriend.

### October 13 Supplemental Social Study Report

The department submitted a supplemental report on October 13 to address the modification hearing on Cynthia's September 15 section 388 petition.

It stated that an August 8, 2022, "Dispositional report," authored by social worker Natalie Cruz, for purposes of the ICWA inquiry, stated, " 'The paternal grandmother is unknown.' "

The supplemental report also outlined Arredondo's 2023 ICWA investigation, stating he was unable to contact father multiple times during April 2023 about his Native American ancestry because father's phone was restricted or unavailable.  It also stated that in April 2023 he "attempted to contact the *paternal grandmother*, [*M. S.-M.*] … regarding the Native American ancestry for [minor]" and left her a voicemail.  (Emphasis added.)  In the report, Arredondo mistakenly referred to minor's paternal *step*-grandmother, M. S.-M., as minor's paternal grandmother, rather than Cynthia, minor's biological paternal grandmother.  It also stated he contacted D.M. about Native American ancestry, and asked D.M. "if there was any Native American ancestry on the *paternal grandmother's* side of the family.  [D.M.] stated there was [not].  I asked for her contact information and [D.M.] did not provide [] her contact information and stated the only Native American ancestry [is] from his mother's [J.M.] side of the family."  However, Arredondo did not use the name of the "paternal grandmother," nor specify whether he was referring to his second wife, M. S.-M., or Cynthia.  (Emphasis added.)

The supplemental report stated that on October 1, 2021, Arredondo mailed a family finding parent letter, a relative log, a postage prepaid return envelope, a civil rights pamphlet, and an IIR pamphlet to father and attempted to make telephone contact with father on the same date.  It stated, Arredondo " 'was able to identify … 18 paternal

relatives (including children and deceased relatives).' " It did not specify the names of those 18 paternal relatives.

The supplemental report also stated that the February 8, 2022, disposition stated, "The paternal grandmother is unknown. The paternal grandfather is [D.M.]. [D.M.] resides in … Missouri," omitting Cynthia's name. The supplemental report also inaccurately stated, "The father has no known siblings …," despite father's brother, R.M., living in Missouri near Cynthia.

The report stated that in the "Family Tree Summary" prepared by Arredondo, "the name of the paternal grandmother was not known and did not appear in the list of relatives that were located." The attached Family Tree Summary showed the name and contact information for mother, maternal grandparents, maternal aunts and uncles, father, paternal grandfather D.M., and D.M.'s wife (paternal step-grandmother M. S.-M.), but is blank in the "Paternal Grandmother" section, not listing Cynthia, as well as blank in the "Paternal Uncles" section not listing father's brother R.M. It also lists numerous names and contact information for D.M.'s extended family.

The supplemental report stated that on April 20, a social worker reported minor as happy to speak with Cynthia but was upset because he did not want to speak about father or his incarceration. It stated that on May 25, the social worker stated the foster parent reported minor did not want to speak with Cynthia. The report stated that on October 4, the foster parent provided a letter to the department written by minor, stating he no longer wanted to be asked with whom he wanted to live, and " 'I have said many time[s] I wanted to stay with my foster [parent] I don't want to be asked anymore.' " The report concluded the benefits of a permanent adoptive home for minor with the foster parent outweighed any detriment.

The supplemental report stated that, with regard to the department's efforts to locate minor's known family members, the department used due diligence, stating:

"father provided little information about his family and according to all available records, did not provide [information regarding Cynthia]. [D.M.] was asked for the name and contact information for [Cynthia], but he declined to provide it. The father was sent a relative log, as was the mother, and they did not return them. According to [Cynthia]'s statements on her original [section 388] petition, she did not know [minor] was in foster care until recently. The Department concludes that the father never informed his mother of [minor]'s whereabouts, and, as a result, there was no contact between [minor] and [Cynthia] for two years. Further, without a name and possible location, the CLEAR database, which contains utility records in other states, there is no way to identify or locate contact information for any person. Thus, although the Department made efforts to locate and notify all known relatives, the Department cannot notify a person whose name is withheld by the family."

### *October 18 Section 388 Modification and Section 366.26 Hearing*

At the October 18 hearing, Cynthia testified in support of her September 13 section 388 modification petition.

The juvenile court stated it remembered from the May 10 hearing on her first section 388 petition that Cynthia had testified that,

"all she knew was that [mother] had shown up and had taken [minor] without permission and he was in California in the foster system. She believed that [father] was doing what he needed to do to get his son back, but he took a downward spiral when he was served—I'm assuming with the [section 366].26 paperwork. He sent that paperwork to her and she has since filed paperwork to stop the adoption and the request for placement.

"So it sounded to me, at the time, that she was aware of the proceedings from the beginning that she just thought her son was going to do what he needed to do and so did not take an active role to seek placement. So whatever that's worth .…"

When Cynthia's counsel asked her, "[W]ere you aware of [minor] coming into the foster system here in California at the beginning of that?" Minor's counsel objected and the juvenile court sustained the objection, stating, "[S]he's already testified about this." Cynthia stated, "No. I knew that [mother] had taken [minor]. That's what I knew." The court admonished her and her counsel objected, but the court overruled it.

22.

Cynthia testified about her telephone and video visits with minor, which sometimes included the twins, and cousins, stating they went well and that minor was happy. She testified she believed it was in minor's best interest to be placed with her because he would be reunited with his siblings and other biological relatives, she would help fill the lack of a mother figure caused by mother's abandonment, it would mitigate the stigma of adoption since he would be with family, and her education and degrees in education would help minor.

Cynthia's counsel argued the evidence from the April 3 section 388 petition and May 10 hearing indicated that Cynthia knew mother had taken minor when the case began but was not aware of actual dependency proceedings being initiated. He then argued that, even if she were aware, it did not obviate the need for the department to follow the requirements of section 309 and exercise due diligence when conducting the family finding search because lay people do not understand the dependency system and their right to request placement and right to participate in the case. He contended that the department never notified Cynthia, which it admitted in its May 2023 report. He argued relatives must be treated fairly during the course of a dependency case.

Minor's counsel argued the department exercised due diligence and that Cynthia's "name simply didn't come up in any of the records, and father didn't respond." She further argued it was in minor's best interest to remain with foster parent.

The juvenile court stated to minor's counsel,

> "I'm not sure that when we had the hearing in May [on her first section 388 petition whether or not] the Court addressed head on the family findings issue. There was certainly the issue of whether [Cynthia] had notice, but I don't think the family findings issue was raised in May."

The department's counsel responded that her recollection was that the family finding issue had been addressed,

> "as far as in the report that her name had not come up and the Court had testimony taken about when she became aware of that issue .… Her

23.

name didn't come up and the Department did do its due diligence with regard to family finding. They sent the father all the information. He didn't reply, and [Cynthia] testified, she knew [minor] was in protective custody. She thought the father was doing what he needed to do to get [minor] back."

Father's counsel joined in Cynthia's counsel's comments, and stated,

"I would also like to point out that Father was incarcerated. I didn't know where Father was for quite a while during this, and he had been vocal in the beginning of this case with me. He wanted placement of his child. He was very upset that Mother had taken his child and he wanted placement. Then he disappeared. And we found out later he was incarcerated.

"So maybe he didn't respond because he simply didn't get the information that was sent to him. I don't know what the answer to that is. But I do know there is a preference for placing with family, and I think it would be horrible to cut those ties for [minor]."

Mother's counsel also supported Cynthia's position.

Minor's counsel asked the juvenile court to deny the petition. He argued that it was in minor's best interest to remain with foster parent, and that it was "well established [Cynthia] was fully aware that he was taken into foster care and she failed to take action because she was … hoping that the father would take action and even reunify with him." He argued minor had little contact with Cynthia over the last two years and was integrated into foster parent's home.

Cynthia's counsel argued the juvenile court's impression that she knew of minor's status in foster care earlier than when she received the section 366.26 notice from father while he was incarcerated was contrary to the department's own report in which it stated it reviewed its own record and there was no evidence that Cynthia was notified that minor was in the department's custody.

The juvenile court did not make a ruling on the section 388 petition at the hearing. The court continued the section 366.26 hearing.

### *October 30 Ruling on the Second Section 388 Modification Petition*

On October 30, the juvenile court filed a ruling denying Cynthia's second section 388 modification petition. It stated the court considered the evidence presented by the parties and oral testimony from the hearing, other documentary evidence admitted during the course of the proceeding, and dependency files in the case.

It stated the department contacted father on September 28, 2021, by phone and he told them he lived in Texas with the twins and had Native American ancestry through paternal grandfather D.M. and D.M.'s mother (minor's great-grandmother J.M.), who was deceased, and that the department advised him of the upcoming detention hearing. It also stated father appeared at the October 22, 2021, jurisdictional hearing but did not appear at the December 14, 2021, jurisdictional hearing.

The ruling stated that Arredondo called father on October 1, 2021, about his extended family and left a voicemail asking him to call back. It stated Arredondo mailed father a family finding parent letter, relative log, and postage prepaid return envelope, and that the March 25, 2022, report stated paternal grandfather was identified as D.M., but stated " '[t]he paternal grandmother is unknown.' "

It stated a social worker had contact with father on October 22, 2021, November 12, 2021, and January 27, 2022, to discuss minor, visitation for father and a reunification plan and father's request for placement of minor.

It also stated the department contacted father regarding his Native American ancestry on D.M.'s side of the family and mailed father a family tree, family questionnaire, and postage prepaid return envelope.

The ruling stated father did not appear at the March 30, 2022, disposition hearing when the department recommended against placing minor with father. It noted a social worker made monthly unsuccessful attempts to contact father between April and July 2022, and on May 20, 2022, the social worker attempted to locate D.M. However, it stated father had previously told the department he had no contact with D.M. and the

25.

phone number he provided for D.M. was not in service. It stated father did not contact the department any further and reunification services were terminated for father on September 30, 2022, and for mother on January 13, 2023. It stated notice of the section 366.26 hearing scheduled for May 10 was mailed to father at a correctional facility in Texas on February 3.[7]

The court noted Cynthia's statement that she only learned of minor's upcoming section 366.26 hearing and status in foster care when she received father's section 366.26 notice from the correctional facility.

The juvenile court ruling repeated Cynthia's testimony from the first section 388 petition hearing, and noted it had denied that petition because it was not in minor's best interest to remove him from his current home, " '[a]nd it does appear that [Cynthia] has had notice of [minor]'s situation, even if not from [the department] but rather from [father] since this matter commenced.' " The court noted Cynthia did not appeal the May 10 finding she had actual notice that minor was in foster care "long before she received notice of the [section] 366.26 hearing from [father] in March 2023."

The court stated Cynthia's second section 388 modification request asserted the department failed to comply with section 358, subdivision (b)(2) to make efforts to find the family of minor and to present evidence of those efforts to the juvenile court. It stated that,

> "Contrary to her previous testimony under oath and the Court's findings at the May 10, 2023 hearing, [Cynthia] asserted in her pleadings, 'I only became aware of [minor] being in foster care on [March 23, 2023].' … She asserted that she thereafter immediately contacted the Department and requested placement. As she lives in Missouri, she applied for placement through the [ICPC]."

---

[7] The record does not have information about how and when the department learned father was incarcerated in Texas so that it could mail him the section 366.26 notice to the correctional facility, rather than his last known address, where everything else had been mailed to him.

The juvenile court's ruling stated minor does not want to leave foster parent.

The ruling stated the family finding social worker, Arredondo, and Byrd reached out to father to ask about his family and sent a family tree for him to complete. It erroneously stated he never responded to either and never sent back the family tree.[8] It stated,

> "The fact that other social workers did not ask [father] about his extended family does not negate the fact that inquiries were made in accordance with the [section 309] statutory requirement. Thus, the Court's May 10, 2023 findings were supported by the evidence, no appeal was taken from the findings, and there is no basis to disturb those findings now."

The ruling stated that, accordingly, it evaluated the September 13 section 388 request on a "strictly best interests standard." It denied Cynthia's petition, finding the evidence showed minor's best interest would not be served by removing him from the foster parent's home.

On December 19, Cynthia timely filed a notice of appeal.

## DISCUSSION

Cynthia contends (1) there is insufficient evidence to support the juvenile court's finding that the department exercised due diligence in its search for minor's relatives, pursuant to section 309, subdivision (e)(1) and rule 5.534(b)(3);[9] (2) the court erred by not applying the section 361.3 preference for placement of minor with relatives; and

---

[8] The juvenile court's statement was inaccurate because, as stated above, while father did not respond to Arredondo's October 1, 2021, call or return his family tree packet, father did respond to Byrd two weeks later on October 18, 2021, and Byrd was able to fill out the ICWA family tree from the information he provided.

[9] Cynthia argues we must apply a de novo standard of review to the issue of due diligence, but the substance of her argument is that there is not sufficient evidence to support the juvenile court's due diligence finding. The department contends the substantial evidence standard applies to this issue. We agree with the department that we must apply the substantial evidence standard to the issue of due diligence.

27.

(3) the court abused its discretion when it found it is not in minor's best interest to be placed with Cynthia.

The department disagrees, arguing the juvenile court's due diligence finding is supported by sufficient evidence. Alternatively, it argues Cynthia had prior knowledge from father that minor was in foster care, negating the department's duty to find and notify her. The department further argues relative placement preference pursuant to section 361.3 is inapplicable because Cynthia applied for placement after disposition and minor was not being moved to a new placement. Last, the department argues the court did not abuse its discretion when it found that it is not in minor's best interest to be placed with Cynthia.

Here, the court's finding that the department exercised due diligence in its search for minor's relatives is not supported by sufficient evidence, and any notice Cynthia had from father that minor was in foster care did not dispel the department's duty to notify her about the proceedings in writing, pursuant to section 309, subdivision (e)(1) and rule 5.534(b)(3). However, Cynthia did not file her section 388 petition until after parents' reunification services were terminated. Accordingly, despite the department's failure to find and notify Cynthia, the court did not err when it found section 361.3's relative placement preference inapplicable and applied the best interest standard. Further, the court did not abuse its discretion when it found that it is not in minor's best interest to be placed with Cynthia, as there is a rebuttable presumption that continued foster care is in the best interest of the child after reunification services are terminated, and minor repeatedly expressed his desire at that point in the proceedings to remain with foster parent.

## I.     DUE DILIGENCE AND WRITTEN NOTICE

Cynthia first contends the juvenile court abused its discretion because there is insufficient evidence to support its finding that the department exercised due diligence to identify, locate, and contact minor's relatives, pursuant to section 309, subdivision (e)(1)

28.

and rule 5.534(b)(3). The department disagrees, and further contends that even if the department did not exercise due diligence in its family finding search, the record shows Cynthia had prior knowledge minor was in foster care from father, dispelling its duty to notify her.

Here, there is insufficient evidence on the record to support the juvenile court's finding in its October 30, 2023 ruling that the department exercised due diligence pursuant to section 309, subdivision (e)(1) and rule 5.534(b)(3) to identify, locate, and contact minor's relatives, including Cynthia. Further, any knowledge Cynthia had of the proceedings from father did not dispel the department's duty to provide her written notification.

### A. Background

On October 1, 2021, Arredondo reported attempting phone contact with father, and leaving a voicemail. He also reported mailing father a family finding parent letter, relative log, postage prepaid return envelope, civil rights pamphlet and a pamphlet called IIR. Arredondo also reported attempting phone contact with L.C. and stated he mailed AB938 letters, a civil rights pamphlet, and an IIR pamphlet to minor's *maternal* relatives.

On October 5, 2021, Arredondo made telephone contact with L.C. He explained to her the resource family approval out-of-county assessment request, and she stated she would contact him again once she had the necessary information and that she understood the process. He did not report asking L.C. about the names and contact information for other relatives, including Cynthia.

On October 5, 2021, Arredondo also reported mailing AB938 letters, a civil rights pamphlet, and an IIR pamphlet to minor's "paternal relatives." However, the report does not specify to which paternal relatives the information was mailed.

On October 18, 2021, only two weeks after Arredondo's one attempted phone call to father and still during the "family finding" period, Byrd made phone contact with father regarding ICWA and mailed him ICWA information, including an ICWA family

29.

tree, an ICWA family tree questionnaire, and a postage prepaid return envelope via certified mail. Father told Byrd minor's paternal grandfather D.M.'s name and contact information, but Byrd did not inquire about paternal grandmother Cynthia's name and contact information because father said only D.M. had Native American ancestry.

On November 1, 2021, the ICWA Form 0-030 was filed by the department with the juvenile court. The ICWA form includes contact information for the paternal grandfather, D.M., paternal grandfather's second wife M. S.-M. (minor's paternal step-grandmother, listed as D.M.'s spouse) and D.M.'s ancestors, including deceased paternal great-grandparents. The section of the ICWA form for "Paternal Grandmother" only states "Does not apply," because father reported only paternal grandfather had Native American ancestry.

On November 5, 2021, Arredondo closed the "family finding" portion of minor's case. The report stated Arredondo was "able to identify 20 maternal relatives (including children and deceased relatives) and 18 paternal relatives (including children and deceased relatives)." The social study report stated he "mailed out 16 AB938 notification letters, Civil Rights Pamphlets, and Relatives Considering Placement of a Child Pamphlets." The report does not state the names of the 18 paternal relatives he was able to identify, nor the names of the 16 relatives to whom he mailed the family finding information packets.

On November 12, 2021, the department contacted father by telephone, who stated he planned to attend the next juvenile court date and wanted placement of minor.

On January 27, 2022, the department again made phone contact with father, who again said he wanted placement of minor.

On March 30, 2022, the juvenile court determined that the department had exercised due diligence in its search for relatives.

In its May 10, 2023, ruling on Cynthia's first section 388 petition, the juvenile court found Cynthia had knowledge from father that minor was in foster care before she received father's section 366.26 notice.

In its October 30, 2023, ruling on Cynthia's second section 388 petition, it again found the department exercised due diligence in its search for minor's relatives.

### B.     Law

"The question of whether the Department exercised due diligence to identify, locate, and contact Minors' relatives is 'primarily a factual matter' that considers the Department's efforts. [Citation.] We therefore review the trial court's due diligence findings for substantial evidence. [Citation.] '[W]e examine the whole record and ask whether any substantial evidence, contradicted or uncontradicted, supports the court's finding[s], indulging all reasonable inferences in support of it.' [Citation.] Substantial evidence 'means evidence that is "reasonable, credible and of solid value; it must actually be substantial proof of the essentials that the law requires in a particular case." ' " (*In re K.B.* (2023) 97 Cal.App.5th 689, 696–697 (*K.B.*).)

"Section 309, subdivision (e)(1) provides that, if a child is removed from parental custody, the social worker must conduct an investigation in order to identify and locate all adult relatives of the child. The social worker must use 'due diligence' in investigating the names and locations of these relatives. ([§ 309], subd. (e)(3).) '[A]dult relatives' include all grandparents, adult relatives who are 'suggested by the parents'….' " (*K.B.*, *supra*, 97 Cal.App.5th at p. 697, emphasis added.)

"Section 309, subdivision (e)(1)(A) requires the social worker to provide written notification within 30 days of removal to all adult relatives who are located (with certain exceptions not applicable here) that the child has been removed from parental custody. Section 309, subdivision (e)(1)(B) requires that the notice include '[a]n explanation of the various options to participate in the care and placement of the child and support for the child's family, including any options that may be lost by failing to respond.' The social

worker must provide written notification as well as 'oral notification, in person or by telephone,' whenever appropriate." (*K.B.*, *supra*, 97 Cal.App.5th at p. 697, emphasis added.)

"In addition to the notice set forth in … section 309, … rule 5.534(b)(3) … requires the social worker to give any located relative a copy of the '[IIR]' document as distributed in the Department of Social Services All County Letter No. 09-86, as well as Judicial Council Forms, form JV-285 (Relative Information) and form JV-287 (Confidential Information). Among other things, form JV-285 asks relatives to identify ways in which they may want to help the child, parents, or social worker, and to provide contact information for other relatives who might be able to help the child." (*K.B.*, *supra*, 97 Cal.App.5th at p. 697, emphasis added.)

"Section 358, subdivision (b)(2) provides that, if the child is removed from parental custody at the time of disposition, the court 'shall make a finding as to whether the social worker has exercised due diligence in conducting the investigation, as required pursuant to paragraph (1) of subdivision (e) of Section 309, to identify, locate, and notify the child's relatives.' When making this finding, the court may consider examples of due diligence that include, among other things, whether the social worker has (1) obtained information about the location of relatives; (2) reviewed the case file for any information regarding relatives; (3) telephoned, e-mailed, or visited all identified relatives; (4) asked located relatives for the names and locations of others; and (5) used online search tools. (§ 358, subd. (b)(3)(B)–(F); … rule 5.695(f)(2)–(6).) When the court finds the social worker has not used due diligence, the court may order the social worker 'to exercise due diligence in conducting an investigation to identify, locate, and notify the child's relatives' and 'may require a written or oral report to the court.' " (*K.B.*, *supra*, 97 Cal.App.5th at pp. 697–698.) The rule does not require postponing disposition or changing placement because the social worker's relative-finding efforts have been inadequate.

### B.    *Analysis*

### *Due Diligence*

The record here does not reflect substantial evidence to support the juvenile court's finding that the department exercised due diligence to identify, locate, contact, and notify Cynthia, pursuant to section 309, subdivision (e)(1) and rule 5.534(b)(3). Here, the department was on notice that minor's paternal grandmother, Cynthia, was alive and father was successfully contacted by other social workers and remotely appeared at court hearings during the family finding search period, but the department failed to identify and locate Cynthia. The record shows that the family finding social worker, Arredondo, attempted to call father only *one time* during the family finding period (September 24 through November 5, 2021) before the court made its due diligence finding. Despite this, the court found the department exercised due diligence in its family finding search.

Section 309, subdivision (e)(1) requires that, if a minor is removed from parental custody, the social worker must conduct an investigation within 30 days in order to identify and locate all adult relatives of the child suggested by the parents. (§§ 309, subd. (e)(1), 319, subd. (h)(2); *K.B.*, *supra*, 97 Cal.App.5th at p. 697.) The factors the juvenile court can look to when determining whether the department has exercised due diligence are permissive, as the court "*may consider* examples of due diligence that include, among other things, whether the social worker has (1) obtained information about the location of relatives; (2) reviewed the case file for any information regarding relatives; (3) telephoned, emailed, or visited all identified relatives; (4) asked located relatives for the names and locations of others; and (5) used online search tools. (§ 358, subd. (b)(3)(B)–(F); … rule 5.695(f)(2)–(6).)" (*K.B.*, at p. 698, emphasis added.)

Father appeared at the first juvenile court hearing on September 29, 2021. When questioned by the court, he stated that *both his mother and father were alive*. However, he did not state their names. The court told father to contact them and asked a social

worker present whether the department had their contact information and the social worker replied they did not.  Father also stated his father, D.M., had Native American ancestry, but that his mother (Cynthia) did not, but he did not state her name.

Accordingly, as of September 29, 2021, the paternal grandmother Cynthia was an " '[a]dult relative[]' … 'suggested by the parents,' " to the department and the court, pursuant to sections 309, subdivision (e)(1) and 319, subdivision (h)(2), although her name was unknown to the department at that time.  (See *K.B.*, *supra*, 97 Cal.App.5th at p. 697.)

We conclude from the record that sufficient evidence does not support the juvenile court's finding in its October 30, 2023 ruling that the department exercised due diligence when searching for " '[a]dult relatives' … 'suggested by the parents,' " (*K.B.*, *supra*, 97 Cal.App.5th at p. 697) because Arredondo only attempted *one* phone call to father during the family finding period from September 24 to November 5, 2021.  He did not attempt to follow up with another phone call to father.  However, during the same period, other social workers were able to contact father numerous times, although they did not ask father about relatives because that was not their assignment.

The record does not show that Arredondo did anything else to further investigate minor's relatives on paternal grandmother's side, such as conducting an online search, or asking other identified relatives about unidentified relatives such as paternal grandmother Cynthia.  Further, father appeared at court hearings during this period, and even stated at the first hearing that paternal grandmother was alive, but the record does not disclose whether Arredondo ever reviewed the case file and attempted to follow up on this information.  Moreover, while the record shows that Arredondo "identified 20 maternal relatives" and "18 paternal relatives" and mailed 16 family finding information packets to relatives during his search, the record does not show the names or contact information for who any of those relatives were, nor whether he attempted to contact them by phone and ask them about other missing relative information.  The record also does not show

34.

whether Arredondo attempted to contact D.M. during the family finding period. However, he was able to contact D.M. two years later, in 2023, to ask him about Native American ancestry during an ICWA inquiry, and at that point erroneously recorded M. S.-M., who was D.M.'s second wife and minor's step-grandmother, as the "paternal grandmother."

We must review the juvenile court's "due diligence findings for substantial evidence. [Citation.] '[W]e examine the whole record and ask whether any substantial evidence, contradicted or uncontradicted, supports the court's finding[s], indulging all reasonable inferences in support of it.' " (*K.B.*, *supra*, 97 Cal.App.5th at pp. 696–697)

Here, the record of Arredondo's efforts during the family finding period after father stated in court that minor's paternal grandmother was alive were minimal at best. Although father did not return Arredondo's only call and did not return the family finding information packet mailed to him, the record does not show whether Arredondo did any follow-up investigation nor whether he asked mother or other relatives whom he was able to obtain contact information whether they knew the name and contact information of missing relatives "suggested by parents," such as Cynthia.

His lack of effort investigating Cynthia's name and contact information, as a relative suggested by father, is also highlighted by the fact that Byrd was able to make phone contact with father during the same period as the family finding search and obtain information about his Native American ancestry, which unfortunately did not encompass Cynthia because father stated at the first court hearing that paternal grandmother did not have Native American ancestry. The lack of records regarding the identities of the 18 paternal relatives Arredondo reported he found and the 16 relatives he reported he sent family finding information packets also does not support the court's inference that he exercised due diligence in his search and makes it difficult to determine whether Arredondo made any efforts to locate anyone on Cynthia's side of the family, rather than just D.M.'s side of the family for ICWA purposes.

Further, while the court's ruling noted numerous instances where the department was unable to contact father, those instances occurred *after* the "family finding" period concluded and the juvenile court's March 30, 2022 due diligence finding regarding Arredondo's investigation of relatives, and were accordingly irrelevant to this issue.

In *In re Arlyne A.* (2000) 85 Cal.App.4th 591, 598–599 (*Arlyne A.*), the department there also filed declarations of due diligence that, in and of themselves, demonstrated a reasonable degree of diligence in trying to locate the appellant family member. The court found, however, that the record plainly demonstrated that the department ignored more timely information supplied by both the child's attorney and parent about what city the appellant's family members were living in. (*Ibid.*) Similarly, here, Arredondo ignored the information supplied by father in the first hearing that paternal grandmother was alive and compounded that by making only one phone to father during the family finding period.

The department argues that *In re S.K.* is analogous, because the parents in *S.K.* were "elusive" and "evasive." (*In re S.K.* (2018) 22 Cal.App.5th 29, 36 (*S.K.*).) However, *S.K.* is distinguishable. While father not returning Arredondo's one phone call or the family finding information packet may also be deemed "elusive," here, Arredondo was able to contact other relatives, including L.C., during the family finding period. However, the record fails to show that he acted with due diligence in asking the other relatives he contacted about missing relatives, such as Cynthia's, information. Nor does the record show which other relatives identified by minor's parents Arredondo investigated, as he simply states he located "18 paternal relatives" without identifying them in the record.

Further, it is possible that father, as a layperson, believed he was responding to Arredondo's call when he spoke with Byrd less than two weeks later and may have also believed that the family finding packet sent by Arredondo and the ICWA family tree packet sent by Byrd were one and the same. A layperson such as father understandably

36.

may not realize they need to respond separately to two different department contacts about their relatives and fill out two separate family tree packets in the same two-week period, because the two inquiries cover similar, overlapping information.

"Where the party conducting the investigation ignores the most likely means of finding the defendant, the service is invalid even if the affidavit of diligence is sufficient. [Citations.]" (*Arlyne A.*, *supra*, 85 Cal.App.4th at pp. 598–599.) Although the department searched the standard avenues available to help locate minor's relatives, it failed to search the specific ones most likely, under the unique facts known to the department, to yield Cynthia's name and address. Accordingly, the juvenile court's finding of due diligence is not supported by sufficient evidence.

### *Written Notice*

The department next argues that, even if there is insufficient evidence to support the juvenile court's due diligence finding, Cynthia had knowledge from father that minor was in foster care before she received father's section 366.26 notice.[10] However, any prior notice Cynthia had from father that minor was in foster care did not dispel the department's duty pursuant to section 309, subdivision (e)(1).

As explained above, section 309, subdivisions (e)(1)(A) and (B) and rule 5.534(b)(3) require due diligence by the department in investigating "adult relatives suggested by the parents," and written notice to located relatives that includes an "explanation of the various options to participate in the care and placement of the child and support for the child's family." (§ 309, subds. (e)(1)(A)–(B).)

Here, the court found when it denied Cynthia's first section 388 petition that she had prior knowledge from father that minor was in foster care, based on her statement that she thought he was doing what he needed to have minor returned to his care.

---

[10] We do not disturb the juvenile court's factual finding in its May 10, 2023, ruling on Cynthia's first section 388 petition that she had prior notice from father that minor was in foster care, as she did not appeal this ruling.

37.

However, contrary to the department's contention, any knowledge Cynthia had from father that minor was in foster care did not dispel the department's duty to find and notify her in writing of the proceedings, pursuant to section 309, subdivision (e)(1)(A) and (B) and rule 5.534(b)(3).

In *K.B.*, the appellate court found that the juvenile court's finding that the children's relatives had "notice" because the social worker was able to contact the relatives to discuss the case was not sufficient, because oral notice did not dispel the requirement for written notice under section 309, subdivision (e)(1) and rule 5.534(b)(3).

Similarly here, any oral notice Cynthia had through father that minor was in foster care before she received his section 366.26 notice did not dispel the department's duty to locate relatives, including Cynthia, and provide written notice of the process by which they could apply for placement of minor in a timely fashion, nor did it create a duty for Cynthia to seek out more information from the department of her own volition. (See *In re R.T.* (2015) 232 Cal.App.4th 1284, 1296 (*R.T.*) [explaining oral advisement of the " 'placement process' " was insufficient, as "[t]here is little reason to believe that the oral advisements sufficiently informed the relatives of the many aspects of the placement process that the statute requires be conveyed in writing"].)

However, as the department's only failure was that it did not find and notify Cynthia in writing, it does not necessitate the relief she requests.

In *R.T.*, the appellate court found that a social services agency had "failed to provide [two paternal aunts] with written notice that is mandated by the statute to explain 'the various options to participate in the care and placement of the child' and the services and support available to them. (§ 309, subd. (e)(1)(B).)" (*R.T., supra,* 232 Cal.App.4th at p. 1296.) The court rejected the agency's claim that oral advice was an adequate substitute. (*Ibid.*) However, *R.T.* involved *numerous other errors* by the agency and the juvenile court, such that the appellate court did not predicate any relief on the agency's failure to provide written notice. (*Id*. at p. 1308.)

"Meaningful redress for past mistakes may not be possible, but we cannot unwind the clock. The interests of stability and continuity may or may not prevail over familial bonds. This difficult question must be decided in the first instance by the juvenile court under the governing legal standards, which must be applied to the circumstances as they exist at the time of the hearing on remand." (*R.T.*, *supra*, 232 Cal.App.4th at p. 1308.)

As the department's failure here to find and notify Cynthia was, unlike in *R.T.*, the only error by department, we must next turn to the court's best interest finding and the application of section 361.3's relative placement preference.

## II.    SECTION 361.3

Cynthia next contends the juvenile court was required to apply section 361.3's relative placement preference to determine whether she is an appropriate placement for minor, and that it erred by instead applying the best interest standard to find minor should not be placed with her. The department disagrees. We agree with the department.

### A.    *Law*

Section 361.3 provides for preferential consideration of a relative's request for placement of a child with the relative early in dependency proceedings, before the disposition order. Section 361.3 states that when a child is removed from the physical custody of his or her parents, "preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative[.]" (§ 361.3, subd. (a).)

In determining whether placement with a relative is appropriate, "the county social worker and court shall consider, but shall not be limited to," consideration of all of eight listed factors, the first of which is the best interest of the child. (§ 361.3, subd. (a)(1)–(8).) Factors to consider in evaluating a placement include, but are not limited to, (1) the best interests of the child, (2) the wishes of the parents, (3) proximity of the placement for visitation and reunification with the parents, (4) placement of any siblings and half siblings in the same home, (5) the good moral character of the relative, (6) the nature and

duration of the relationship between the child and relative, (7) the relative's ability to provide appropriate and safe care of the child and facilitate visitation with the child's other relatives, and (8) the safety of the home. (§ 361.3, subd. (a)(1)−(8).) In addition to the factors described in subdivision (a), the county social worker shall consider whether the relative has established and maintained a relationship with the child." (§ 361.3, subd. (d); *In re M.H.* (2018) 21 Cal.App.5th 1296, 1303.) "The linchpin of a section 361.3 analysis is whether placement with a relative is in the best interests of the minor." (*Alicia B. v. Superior Court* (2004) 116 Cal.App.4th 856, 862−863.)

" 'Preferential consideration' means that the relative seeking placement shall be the first placement to be considered and investigated." (§ 361.3, subd. (c)(1); *In re J.Y.* (2022) 76 Cal.App.5th 473, 477–478 (*J.Y.*).) To summarize, when a dependent child has been removed from his or her home, the Legislature expresses a clear preference for placement with a relative, if the home is appropriate and the placement is in the child's best interest. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 320 (*Stephanie M.*).)

If the child's placement must change after disposition, relatives again must be given preference. (§ 361.3, subd. (d) ["[s]ubsequent to [the disposition hearing], whenever a new placement of the child must be made, consideration for placement shall again be given … to relatives who have not been found to be unsuitable and who will fulfill the child's reunification or permanent plan requirements"]; *J.Y.*, *supra*, 76 Cal.App.5th at p. 478; see also *Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1032 [applying § 361.3 after reunification period where child had to be moved].) Some courts have held the relative preference applies throughout the reunification period even where a new placement is not required. (E.g., *In re Maria Q.* (2018) 28 Cal.App.5th 577, 592 (*Maria Q.*) [appellate courts " 'consistently' " have held " 'that the relative placement preference applies at least through the family reunification period … regardless of whether a new placement is required or is otherwise being considered by the dependency court' "]; but see *In re D.P.* (2023) 92 Cal.App.5th 1282, 1294 (*D.P.*)

[relative placement preference " 'is applicable after disposition only when a new placement is necessary' "].)  In other words, juvenile courts still "should consider relatives who have come forward [during the reunification period] after an initial placement with a nonrelative[.]" (*Amber G. v. Superior Court* (2022) 86 Cal.App.5th 465, 491.)

The statutory relative placement preference does not apply after parental rights have been terminated.  (§ 361.3.)

*Standard of Review*

The application of a statute to undisputed facts is a question of law that we review de novo.  (*D.P.*, *supra*, 92 Cal.App.5th at p. 1292.)

**B.     Analysis**

Here, the court did not err in finding the relative placement preference pursuant to section 361.3 inapplicable, as the parents' reunification services were terminated before Cynthia filed her section 388 petition, and minor was not in need of a new placement. (See *J.Y.*, *supra*, 76 Cal. App. 5th at p. 478.)

Section 361.3 provides that the relative placement preference applies at the disposition hearing (§ 358) and later "whenever a new placement of the child must be made."  (§ 361.3, subd. (d); see *In re Sarah S.* (1996) 43 Cal.App.4th 274, 285 ["[S]ection 361.3 assures interested relatives that, when a child is taken from her parents and placed outside the home pending the determination whether reunification is possible, the relative's application will be considered before a stranger's application"].)  In addition, " '[a]ppellate court decisions have consistently held that the relative placement preference applies at least through the family reunification period.  [Citations.]  During the reunification period, the preference applies regardless of whether a new placement is required or is otherwise being considered by the dependency court.' [Citations.]  If a new placement is required during the reunification period, the child welfare agency has an

41.

independent, affirmative duty to seek out relatives who would qualify for the relative placement preference." (*Maria Q.*, *supra*, 28 Cal.App.5th at pp. 592–593.)

However, in this case, the dependency was far removed from disposition and Cynthia's requests came more than three months after the parents' reunification services had been terminated.

In *J.Y.*, the appellate court recently assessed the applicability of section 361.3 for relatives who did not come forward to apply for placement of the minor until after the parents' reunification services were terminated and the court had set a section 366.26 hearing to select a permanent plan for the minor, who was in a stable, loving placement with de facto parents who wanted to adopt him. (*J.Y.*, *supra*, 76 Cal.App.5th at p. 478.) There, the court found the department fully complied with its obligation to assess family members for placement during the reunification period, but the out-of-state relatives had still not been discovered. Accordingly, the *J.Y.* court found the trial court abused its discretion by setting a section 361.3 hearing after the reunification period ended, because the department had fulfilled its obligations to assess relatives for placement during reunification, and there was no need to change the minor's placement.

The holding in *J.Y.* is consistent with the appellate court's earlier holding in *In re Isabella G.* (2016) 246 Cal.App.4th 708, 722–723 (*Isabella G.*).) There, the appellate court held the relative placement preference applies even after the reunification period where the relative has come forward seeking placement of the child during the reunification period, and the agency has ignored the relative's request for placement. (*Ibid.*)

Here, although the facts are slightly different than those in both *Isabella G.* and *J.Y.*, and despite the department's failure to find and notify Cynthia before the reunification period ended, *J.Y.* is applicable. As discussed above, the department here failed to properly investigate and notify Cynthia. However, the juvenile court found in its denial of her first section 388 petition that she had notice earlier in the proceedings from

father that minor was in foster care but failed to take action until she received the section 366.26 notice. While, as discussed above, notice from father did not dispel the department's duty to find and notify her in writing of the proceedings, she did not appeal the court's finding on this issue and it is part of the record. Accordingly, considering Cynthia knew minor was in foster care before reunification services were terminated but did not file her section 388 petition until after she received father's section 366.26 notice, this is not a case like *Isabella G.* where relatives made a timely request for placement, but is more similar to *J.Y.*, where the minor's relatives did not apply for placement until after reunification ended because they did not know minor was in foster care until then, but the department had not failed in its search. Accordingly, we conclude the section 361.3 relative placement preference does not apply in this case.

## III. BEST INTEREST

As section 361.3's relative placement preference does not apply, we must next determine whether the court abused its discretion when it found that not placing minor with Cynthia was in his best interest at the time of the section 388 hearing.

Cynthia contends the juvenile court abused its discretion when it found it was not in minor's best interest to be placed with her. The department disagrees. We agree with the department.

### A. Law

"Any parent or other person having an interest in a child who is a dependent child of the juvenile court … may, upon grounds of change of circumstance or new evidence, petition the court … for a hearing to change, modify, or set aside any order of court previously made …." (§ 388, subd. (a)(1).) "If the petition filed under section 388[, subdivision] (a) … states a change of circumstance or new evidence and it appears that the best interest of the child, nonminor, or nonminor dependent may be promoted by the proposed change of order or termination of jurisdiction, the court may grant the petition…." (Rule 5.570(e)(1); see also *In re B.D.* (2008) 159 Cal.App.4th 1218, 1228

43.

(*B.D.*).)  At a hearing on a motion for change of placement, the burden of proof is on the moving party to show by a preponderance of the evidence that there is new evidence or that there are changed circumstances that make a change of placement in the best interest of the child.  (§ 388; *In re Audrey D.* (1979) 100 Cal.App.3d 34, 45; rule 1432(f).)  "[A] relative seeking modification of an order continuing a child in foster care must file a section 388 motion."  (*Maria Q*., *supra,* 28 Cal.App.5th at p. 598.)

After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount.  Rather, at this point "the focus shifts to the needs of the child for permanency and stability" (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309 (*Marilyn H.*)), and in fact, there is a rebuttable presumption that continued foster care is in the best interest of the child.  (*Ibid.*)  A court hearing a motion for change of placement pursuant to section 388 at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interest of the child.

Further, "[t]he overriding concern of dependency proceedings ... is not the interest of extended family members but the interest of the child," whose bond with a foster parent may require that placement with a relative be rejected.  (*In re Lauren R.* (2007) 148 Cal.App.4th 841, 855.)  In any custody determination, a primary consideration in determining the child's best interest is the goal of assuring stability and continuity.  (*Burchard v. Garay* (1986) 42 Cal.3d 531, 538, and fn. 6.)  "When custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role.  That need will often dictate the conclusion that maintenance of the current arrangement would be in the best interests of that child."  (*Ibid.*, fn. omitted.)

"We review the grant or denial of a petition for modification under section 388 for an abuse of discretion.  [Citations.]  The abuse of discretion standard gives the court substantial latitude.  However, the scope of the court's discretion is determined by the

legal principles governing the subject of the action.  A judicial determination that falls outside the applicable principles of law constitutes an abuse of discretion." (*In re Y.M.* (2012) 207 Cal.App.4th 892, 918; see also *B.D., supra,* 159 Cal.App.4th at p. 1228.) "[A] court abuses its discretion when it applies incorrect legal standards [citation]." (*In re Shannon M.* (2013) 221 Cal.App.4th 282, 289.)  The appellant bears the burden of showing that the juvenile court abused its discretion in denying his petition under section 388.  (See *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423.)

### B.     Analysis

Here, the court did not abuse its discretion in finding it was not in minor's best interest to be placed with Cynthia.  Cynthia's section 388 petition was not filed until after the parents' reunification services were terminated.  At such a late stage in the proceedings, the paramount concern is minor's need for permanency and stability, and there is a rebuttable presumption that continued foster care is in the best interest of the child.  (See *Marilyn H.*, *supra*, 5 Cal.4th at p. 309.)

The order under our review in this case came late in the proceedings, after the court had found jurisdiction (§§ 334, 355), removed minor from mother's care and placed him in foster care (§ 358), undertaken the six-month and twelve-month review hearings (§ 366), and concluded that it was unlikely minor could be reunified with his parents (§ 366.21).  The matter was set for a hearing on selection and implementation of a permanent plan (§ 366.26), that is, for the hearing at which parental rights would ultimately be terminated, when Cynthia interposed her first section 388 motion for a change or reconsideration of the earlier placement order.  Such a motion may be brought pursuant to section 388 at any time after the minor has been declared a dependent child of the juvenile court.  (See *Marilyn H.*, *supra*, 5 Cal.4th at pp. 308–309.)

Following termination of reunification services, the focus necessarily shifts to the needs of the child for permanency and stability.  (*Marilyn H.*, *supra*, 5 Cal.4th at pp. 308–309.)  Here, the trial court found minor's needs for stability with foster parent overrode

Cynthia's belated claims that he should be placed with her. Furthermore, even when the relative preference applies, "the fundamental duty of the court is to assure the best interests of the child, whose bond with a foster parent may require that placement with a relative be rejected." (*Stephanie M.*, *supra*, 7 Cal.4th at p. 321.) A child, such as minor, has a "fundamental right" (*In re Jasmon O.* (1994) 8 Cal.4th 398, 419) "to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child." (*Marilyn H.*, *supra*, 5 Cal.4th at p. 306.)

Here, the juvenile court found that it would cause minor great detriment to be removed from his adoptive family. The court pointed in its ruling to multiple statements by minor expressing his preference to continue living with foster parent and did not want to be placed with Cynthia, including a note written by minor stating, "I am [minor]. I have been ask a lot of times if I want to live with my foser [parent], or move with my grandmother [Cynthia]. I have said many times I wanted to stay with my foser [parent] I don't want to Be ask eny more when I am ask it makes me fill mad … Please don't ask me any more [signed minor]." (Spelling and punctuation in original.) It further noted that minor had lived with the same foster parent for approximately two years. Accordingly, the juvenile court found it was in minor's best interest, as of the time of the section 388 hearing, to not be placed with Cynthia.

In our view, the juvenile court properly evaluated the evidence and, placing special weight on minor's need for stability, as was appropriate at that stage of the proceedings, determined that Cynthia had not carried her burden of proof. If we focus on the evidence of the possible effects on minor of placement with Cynthia, it is clear the juvenile court was well within its discretion in deciding that a change of placement was not in minor's best interest. The evidence at the hearing showed that Cynthia had not visited, written, or attempted to contact minor from the time he was taken by mother to California in 2021 until she received the section 366.26 notice in 2023. Even before mother took him to California, Cynthia had limited contact with minor, stating in her

petition that she visited minor two to three times a year. Regardless of the cause of these omissions, the record shows minor lacked a significant bond to Cynthia by the time of the hearing on the section 388 petition, while there is strong evidence minor has a strong primary bond with foster parent and was uneasy with the idea of being placed with Cynthia.

The question before the juvenile court at the hearing on change of placement was, at its heart, whether a change of placement at such a late point in the proceedings was in the best interest of minor. Cynthia's home had been evaluated. She testified at the hearing. The court did not question that her home was a suitable one. Nonetheless, it was the considered judgment of the juvenile court that a change of placement was not in minor's best interest at that late stage in the proceedings, in view of his successful bond with the foster parent. We see no abuse of discretion or misapplication of the statute in this conclusion.

The department's failures discussed above at the early family finding stage of the proceedings clearly have negative repercussions for Cynthia, and we have no doubt minor would derive a benefit from cultivating a relationship with her, but "the fundamental duty of the juvenile court is to 'assure the best interest of the child.' " (*Stephanie M., supra,* 7 Cal.4th at p. 320.) As the juvenile court applied the correct legal standard and its finding that it is in minor's best interest to not be placed with Cynthia is not beyond the bounds of reason, this determination was committed to the sound discretion of the juvenile court.[11] (*Ibid.*); *In re Jessica Z.* (1990) 225 Cal.App.3d 1089,

---

[11] While we affirm the trial court's order based on the best interest of minor at this late stage of the proceedings, we do not wish to sweep the department's nominal efforts at executing its family-finding duties under the proverbial rug. Our affirmance should not be interpreted as condoning or excusing the dilatory and minimal efforts of the department in searching for minor's relatives, including Cynthia; nor should it be interpreted as a judgment on Cynthia's commendable desire or suitability in raising her grandchild in a loving and caring home.

1100; see *In re Michael B.* (1992) 8 Cal.App.4th 1698, 1704; *In re Corey* (1964) 230 Cal.App.2d 813, 831-832.)

## **DISPOSITION**

The juvenile court's order is affirmed.

SNAUFFER, J.

WE CONCUR:


LEVY, Acting P. J.


SMITH, J.

---

Our ruling is essentially a matter of timing as to the filing of Cynthia's section 388 petition. We recognize, as we hope all the parties here do, that at such a late stage in the proceedings as when Cynthia's section 388 petition was filed, the most important concern is minor's best interest, which, based on minor's numerous statements in the record, is to remain with foster parent. It also gives us some reassurance and consolation that foster parent plans to adopt minor and that foster parent supports continuing minor's long-distance relationship with Cynthia.